**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) SHARI PETTIT, as Administrator of the Estate of DAVID HOGAN, deceased,<br><br>Plaintiff,<br><br>v.<br><br>(1) TURN KEY HEALTH CLINICS, LLC,<br>(2) VIC REGALADO, in his official capacity,<br>(3) JESSICA MOBLEY, RN,<br>(4) ANDREW SKOUSEN, DNP,<br><br>Defendants. | ) | Case No.: 26-cv-00669-JFJ<br><br>Jury Trial Demanded<br><br>Attorney Lien Claimed |

## COMPLAINT

**COMES NOW**, Shari Pettit ("Plaintiff"), as the Administrator of the Estate of David Hogan ("Mr. Hogan"), deceased, and for her causes of action against the above-named Defendants, alleges and states the following:

## PARTIES, JURISDICTION AND VENUE

1. Plaintiff was, at the pertinent times underlying this Complaint, a resident of Tulsa County, Oklahoma. Plaintiff is the Administrator of the Estate of David Hogan, deceased. Plaintiff is also Mr. Hogan’s sister. The causes of action in this matter are based on violations of Mr. Hogan’s rights under the Fourteenth Amendment to the United States Constitution.

2. Defendant Turn Key Health Clinics, LLC ("Turn Key") is an Oklahoma limited liability company doing business in Tulsa County, Oklahoma. Turn Key is a private correctional health care company that contracts with counties, including, during the pertinent timeframe, Tulsa County, to provide medical professional staffing, supervision and care in county jails. Turn Key was at all times relevant hereto responsible, in part, for providing medical services, supervision and medication to Mr. Hogan while he was in the custody of the Tulsa County Sheriff’s Office

("TCSO"). Turn Key was additionally responsible, in part, for creating, implementing and maintaining policies, practices and protocols that govern the provision of medical and mental health care to inmates at the Tulsa County Jail, and for training and supervising its employees. Turn Key was, at all times relevant hereto, endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an agency or instrumentality of the State and subject to its constitutional limitations.

3. Defendant Vic Regalado ("Sheriff Regalado" or "Defendant Regalado") is the Sheriff of Tulsa County, Oklahoma, residing in Tulsa County, Oklahoma and acting under color of State law. Sheriff Regalado is sued purely in his official capacity. It is well-established, as a matter of Tenth Circuit authority, that a § 1983 claim against a county sheriff in his official capacity "is the same as bringing a suit against the county." *Martinez v. Beggs,* 563 F.3d 1082, 1091 (10th Cir. 2009). *See also Porro v. Barnes,* 624 F.3d 1322, 1328 (10th Cir. 2010); *Bame v. Iron Cnty.,* 566 F. App'x 731, 737 (10th Cir. 2014). Thus, in suing Sheriff Regalado in his official capacity, Plaintiff has brought suit against the County/TCSO. The Tulsa County Sheriff is the "Tulsa County official responsible for promulgating and enforcing policies for the [Jail], providing medical care to inmates and detainees, and operating the jail on a daily basis." *Wirtz v. Regalado,* No. 18-CV-0599-GKF-FHM, 2020 WL 1016445, at *6 (N.D. Okla. Mar. 2, 2020) (citing 19 Okla. Stat. § 513; *Estate of Crowell ex rel. Boen v. Bd. of Cty. Comm'rs of Cleveland Cty.,* 237 P.3d 134, 142 (Okla. 2010)).

4. Defendant Jessica Mobley, RN ("Nurse Mobley") was, at all times relevant hereto, an employee and/or agent of Turn Key and the County/TCSO, who was, in part, responsible for overseeing Mr. Hogan's health and well-being, and assuring that Mr. Hogan's medical needs were met, during the time he was in the custody of TCSO. At all times pertinent, Nurse Mobley was acting within the scope of her employment and under color of law. Nurse Mobley is being sued in her individual capacity.

5. Defendant Andrew Skousen, DNP ("DNP Skousen") was, at all times relevant hereto, an employee and/or agent of Turn Key and the County/TCSO. DNP Skousen is a Doctor of Nursing Practice who, as a mid-level provider, was, in part, responsible for evaluating, monitoring, and treating Mr. Hogan's chronic medical conditions, including through the Jail's Chronic Care Clinic, and for referring Mr. Hogan to a physician or outside provider when his medical needs required it, during the time he was in the custody of TCSO. At all times pertinent, DNP Skousen was acting within the scope of his employment and under color of law. DNP Skousen is being sued in his individual capacity.

6. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343 to secure protection of and to redress deprivations of rights secured by the Fourteenth Amendment to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under color of law.

7. The jurisdiction of this Court is also invoked under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

8. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

9. Paragraphs 1-8 are incorporated herein by reference.

### A. Facts Specific to Mr. Hogan

10. Mr. Hogan was booked into the Tulsa County Jail ("Jail") on or around May 24, 2024. At the time, Mr. Hogan was 60 years old.

11. At all pertinent times, Mr. Hogan was a pre-trial detainee.

12. Mr. Hogan suffered from serious, pre-existing medical and mental health conditions. His mental health conditions, including schizoaffective disorder, bipolar type, were obvious even to a layperson from the time of his booking.

13. Mr. Hogan also suffered from serious cardiovascular and respiratory conditions, including a documented history of congestive heart failure, hypertensive and atherosclerotic cardiovascular disease, myocardial infarction, and dysrhythmia, as well as chronic obstructive pulmonary disease. Further, Mr. Hogan suffered from Hepatitis C and Immune Deficiency Disorder.

14. Mr. Hogan had been prescribed numerous medications to treat his medical and mental health conditions. Mr. Hogan was prescribed metoprolol and nitroglycerin for his hypertension and heart disease. He was prescribed Olanzapine and a monthly Invega Sustenna injection for his schizophrenia.

15. Because of his severe mental illness, Mr. Hogan was frequently agitated, disorganized, and in active psychosis while at the Jail.

16. On May 24, 2024, the day of his booking, a TCSO detention officer performed an intake screening. No vital signs were obtained, and Turn Key did not conduct its own medical intake screening until four days later, on May 28, 2024.

17. From the outset of his incarceration, Turn Key and TCSO staff were aware that Mr. Hogan had a history of severe mental illness. On May 27, 2024, Turn Key staff documented that Mr. Hogan had a history of severe mental illness and that hallucinations were present.

18. Rather than ensuring that Mr. Hogan received an appropriate medical and mental health evaluation, Turn Key placed him on Mental Health Evaluation status in restrictive/infirmary housing, where he remained agitated, disheveled, psychotic, and untreated.

19. Mr. Hogan was routinely unable to cooperate with medical assessments due to his psychosis. On May 28, 2024, during Turn Key's medical intake screening, Mr. Hogan refused to

allow the Turn Key nurse to obtain his vital signs and was unable to answer medical and personal history questions.

20. On June 7, 2024, Turn Key nurse Colleen Ross was unable to obtain a history and physical or perform a PPD implant because Mr. Hogan was aggressive, and a refusal form was completed and witnessed by Turn Key physician Kent King, D.O.

21. Turn Key was aware that Mr. Hogan's severe mental illness rendered him unable to reliably report his own medical history or to advocate for his own medical needs. Turn Key also knew, by May 28, 2024, that Mr. Hogan was an active participant in a Family & Children's Services Program of Assertive Community Treatment ("PACT") team—an outside treatment team from which his medical history and medication list could readily have been obtained. Despite this, Turn Key never obtained Mr. Hogan's outside medical records and never had Mr. Hogan evaluated by a physician for his serious cardiovascular and respiratory conditions during the nearly five months he was in custody.

22. On or about June 5, 2024, Mr. Hogan began receiving duloxetine and olanzapine for his mental health conditions, but he was not started on any of his prescribed medications for hypertension or heart disease.

23. Unfortunately, the mental health medications the Jail administered to Mr. Hogan were utterly ineffective, and his mental health conditions remained uncontrolled.

24. On June 28, 2024, Turn Key Licensed Professional Counselor ("LPC") Rachel Waltrip encountered Mr. Hogan and observed him to be agitated, verbally aggressive, hallucinating, and displaying poor hygiene.

25. On July 5, 2024, Turn Key APRN Aimee Clark observed Mr. Hogan in a manic state and evidencing flight of ideas.

26. On July 5, 2024, Mr. Hogan's blood pressure was recorded at an elevated 126/97. On July 8, 2024, a Turn Key provider reviewed that reading and directed that Mr. Hogan be established in the Jail's Chronic Care Clinic. On July 12, 2024, Turn Key DNP Andrew Skousen saw Mr. Hogan in his cell for a Chronic Care Clinic visit. DNP Skousen purportedly was unable to obtain a detailed health history. DNP Skousen observed Mr. Hogan talking constantly, agitated, and aggressive. In the same note, DNP Skousen documented that Mr. Hogan was "unable to stay on topic when asked about health history and medications." DNP Skousen nonetheless made no effort to further investigate his health history and medications.

27. Notwithstanding his inability to obtain a reliable medical history from Mr. Hogan, who was still exhibiting signs of serious mental illness, and notwithstanding Mr. Hogan's serious underlying cardiovascular and respiratory conditions, DNP Skousen assessed Mr. Hogan's status as "Stable" with a "Fair" degree of control, ordered only weekly blood pressure checks, scheduled the next chronic care follow-up in 90 days, and discharged Mr. Hogan from the Chronic Care Clinic.

28. DNP Skousen did not refer Mr. Hogan to a physician, did not arrange for an off-site cardiac or medical evaluation, and did not take steps to obtain Mr. Hogan's outside medical records so that his serious cardiovascular history could be appropriately managed. As the Turn Key provider responsible for Mr. Hogan's chronic care, DNP Skousen knew, or must have known, that Mr. Hogan suffered from serious, chronic cardiovascular and respiratory conditions, and knew, or must have known, that Mr. Hogan's severe mental illness prevented him from reliably reporting his own symptoms and medical history.

29. On August 2, 2024, Mr. Hogan's vitals were taken. His blood pressure was abnormally low (92/70), with a narrow pulse pressure of just 22 mmHg, and his oxygen saturation was measured at 93%, below the normal range. That same morning, DNP Skousen saw Mr. Hogan,

noted his low oxygen saturation, attributed it to chronic obstructive pulmonary disease, and placed him on a maintenance inhaler—but did nothing to evaluate or address his abnormally low blood pressure.

30. That same day, Mr. Hogan's blood was drawn for the routine laboratory tests.

31. The results of Mr. Hogan's blood test revealed abnormal results indicating risk of cardiovascular disease, including anemia (low red blood cell count, hemoglobin, and hematocrit) and elevated LDL cholesterol. Turn Key staff initialed the results on or about August 5, 2024. Yet Turn Key took no measures to further evaluate or address Mr. Hogan's cardiovascular condition—no EKG, no cardiac testing, and no referral to a physician.

32. The weekly blood pressure monitoring and close medical oversight that Mr. Hogan's chronic condition required were not carried out. DNP Skousen ordered weekly blood pressure checks on July 12, 2024, but those weekly checks were performed only three times—on July 14, July 21, and August 4, 2024. Of the remaining ten weekly checks scheduled through October 6, 2024, six were marked "refused" and four were simply deleted from the schedule, and no weekly checks were scheduled at all after October 6. After September 6, 2024, Mr. Hogan's blood pressure was taken only once more before his death, on October 11, 2024. Mr. Hogan's serious cardiovascular disease went inadequately monitored and untreated throughout his incarceration.

33. Throughout July and August 2024, Mr. Hogan's blood pressure readings were generally in the hypertensive range—for example, 126/97 on July 5, 124/99 on August 16, and 122/87 on August 23—even though he was receiving no blood pressure medication. On September 6, 2024, however, his blood pressure had dropped to an abnormally low 97/66.

34. Mr. Hogan's blood pressure had thus dropped sharply from his hypertensive baseline, even though he was receiving no blood pressure-lowering medication. In a patient with Mr. Hogan's cardiovascular disease—including, as his outside medical records would have shown, a

history of congestive heart failure—an unexplained drop in blood pressure of this kind is a well-recognized warning sign that the heart is failing to pump adequately and that the patient's heart failure is worsening. Such findings require prompt evaluation by a physician, including, at a minimum, an EKG, laboratory testing, and assessment of the patient's cardiac function and fluid status. Despite these obvious warning signs, neither Turn Key staff nor Jail staff took any measures to evaluate or address Mr. Hogan's deteriorating cardiac condition.

35. The next time Mr. Hogan's vitals were taken was October 11, 2024. Upon information and belief, Turn Key nurse Nurse Mobley took Mr. Hogan's blood pressure. His blood pressure was even lower at 93/60. This was the second consecutive reading showing a marked drop from Mr. Hogan's previously hypertensive blood pressure, and a further sign that his heart failure was worsening. The day before, on October 10, 2024, Mr. Hogan's scheduled 90-day chronic care follow-up visit with DNP Skousen did not take place; DNP Skousen documented it as "Refused / No Show" on a Turn Key waiver form that Mr. Hogan did not sign, and no further chronic care visit was ever conducted.

36. Upon information and belief, Mr. Hogan began experiencing serious symptoms related to his cardiovascular disease, including chest pain, shortness of breath, and fatigue.

37. Upon information and belief, Mr. Hogan reported these symptoms to Nurse Mobley, who neither reported Mr. Hogan's low blood pressure and other symptoms of cardiovascular issues to a more highly trained medical provider, nor did anything to address Mr. Hogan's serious medical conditions.

38. Upon information and belief, Mr. Hogan continued to display alarming symptoms indicating a serious medical condition between October 11 and October 22, 2024, including extreme fatigue, chest pain, and shortness of breath.

39. Additionally, upon information and belief, Mr. Hogan began defecating on himself. Despite these alarming symptoms, Mr. Hogan was not assessed by a physician, not started on any medications for his cardiovascular issues, not given any testing, such as an EKG, and not sent to an outside medical provider.

40. Upon information and belief, Mr. Hogan spent most of October 11-22, 2024 lying in his cell, covered in his own waste, struggling to stay alive. The gravity of his situation was obvious, even to a layperson.

41. On October 22, 2024, at approximately 1:24 p.m., a medical emergency was called after Mr. Hogan was found unresponsive and pulseless in his cell. Mr. Hogan was found covered in his own feces. He was in full cardiac arrest, and no vital signs were present upon the arrival of medical staff.

42. Turn Key nurses, including Crystal Whisenhunt, LPN, Jessica Waller, LPN, and Richard Dutra, LPN, along with additional nursing staff, continued the cardiopulmonary resuscitation that a detention officer had begun shortly before they arrived, and applied an automated external defibrillator, which advised no shock. The Tulsa Fire Department arrived at approximately 1:30 p.m. and took over resuscitation efforts, and EMSA arrived at approximately 1:34 p.m., started an intravenous line, administered epinephrine, and continued CPR.

43. Mr. Hogan was transported by ambulance to OSU Medical Center at approximately 1:57 p.m. with continued CPR and still without a pulse.

44. Mr. Hogan was pronounced dead at OSU Medical Center at approximately 2:25 p.m. on October 22, 2024. He was 61 years old.

45. The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Hogan died as a result of complications of congestive heart failure due to hypertensive and atherosclerotic cardiovascular disease. Autopsy findings included cardiomegaly (a heart weighing 672 grams),

scarring of the myocardium of the left ventricle, and severe pericardial fibrosis. The autopsy also found 1,400 milliliters of fluid in Mr. Hogan's pleural (chest) cavities. The Medical Examiner further identified Mr. Hogan's documented history of congestive heart failure and hypertensive and atherosclerotic cardiovascular disease, and noted other significant conditions contributing to death, including Hepatitis C and a history of myocardial infarction and dysrhythmia.

**B. The Jail's Unconstitutional Health Care Delivery System / Policies and Customs**

46. The deliberate indifference to Mr. Hogan's serious medical needs and his safety, as summarized *supra*, was in furtherance of and consistent with: a) policies, customs, and/or practices which TCSO promulgated, created, implemented or possessed responsibility for the continued operation of; and b) policies, customs, and/or practices which Turn Key developed and/or had responsibility for implementing.

47. To the extent that no single officer or professional violated Mr. Hogan's constitutional rights, Tulsa County/Sheriff and Turn Key are still liable under a theory of a systemic failure of policies and procedures as described below. There were such gross deficiencies in medical procedures, facilities, and procedures that Mr. Hogan was effectively denied constitutional conditions of confinement.

48. There are longstanding, systemic deficiencies in the medical and mental health care provided to inmates at the Tulsa County Jail. Both Sheriff Regalado and Former Sheriff Stanley Glanz have long known of these systemic deficiencies and the substantial risks they pose to inmates like Mr. Hogan but failed to take reasonable steps to alleviate those deficiencies and risks.

49. For instance, in 2007, the National Commission on Correctional Health Care ("NCCHC"), a corrections health accreditation body, conducted an on-site audit of the Jail's health services program. At the conclusion of the audit, NCCHC auditors reported serious and systemic deficiencies in the care provided to inmates, including failure to perform mental health screenings,

failure to fully complete mental health treatment plans, failure to triage sick calls, failure to conduct quality assurance studies, and failure to address health care needs in a timely manner. NCCHC made these findings of deficient care despite Former Sheriff Glanz's/TCSO's efforts to defraud the auditors by concealing information and falsifying medical records and charts.

50. Former Sheriff Glanz failed to change or improve any health care policies or practices in response to NCCHC's findings.

51. There is a long-standing failure to secure adequate mental health care, and to properly classify and protect inmates with obvious and serious mental health needs. For example, in 2009, TCSO was cited by the Oklahoma State Department of Health for violation of the Oklahoma Jail Standards in connection with the suicide death of an inmate with schizophrenia.

52. In August of 2009, the American Correctional Association ("ACA") conducted a "mock audit" of the Jail. The ACA's mock audit revealed that the Jail was non-compliant with "mandatory health standards" and "substantial changes" were suggested. Based on these identified and known "deficiencies" in the health delivery system at the Jail, the Jail Administrator sought input and recommendations from Elizabeth Gondles, Ph.D. ("Dr. Gondles"). Dr. Gondles was associated with the ACA as its medical director or medical liaison. After reviewing pertinent documents, touring the Jail and interviewing medical and correctional personnel, on October 9, 2009, Dr. Gondles generated a Report, entitled "Health Care Delivery Technical Assistance" (hereinafter, "Gondles Report"). The Gondles Report was provided to the Jail Administrator, Michelle Robinette. As part of her Report, Dr. Gondles identified numerous "issues" with the Jail's health care system, as implemented by the Jail's former medical provider, CHC. After receiving the Gondles Report, Chief Robinette held a conference, to discuss the Report, with the Undersheriff, Administrative Captain and CHC/CHM.

53. Among the issues identified by Dr. Gondles, as outlined in her Report, were: (a) understaffing of medical personnel due to CHM misreporting the average daily inmate population; (b) deficiencies in "doctor/PA coverage"; (c) a lack of health services oversight and supervision; (d) failure to provide new health staff with formal training; (e) delays in inmates receiving necessary medication; (f) nurses failing to document the delivery of health services; (g) systemic nursing shortages; (h) failure to provide timely health appraisals to inmates; and (i) 313 health-related grievances within the past 12 months. Dr. Gondles concluded that "[m]any of the health service delivery issues outlined in this report are a result of the lack of understanding of correctional healthcare issues by jail administration and contract oversight and monitoring of the private provider." Based on her findings, Dr. Gondles "strongly suggest[ed] that the Jail Administrator establish a central Office Bureau of Health Services" to be staffed by a TCSO-employed Health Services Director ("HSD"). According to Dr. Gondles, without such an HSD in place, TCSO could not properly monitor the competency of the Jail's health staff or the adequacy of the health care delivery system.

54. Nonetheless, TCSO leadership chose not to follow Dr. Gondles' recommendations. TCSO did not establish a central Office Bureau of Health Services nor hire the "HSD" as recommended.

55. On October 28, 2010, Assistant District Attorney Andrea Wyrick wrote an email to Josh Turley, TCSO's "Risk Manager". In the email, Ms. Wyrick voiced concerns about whether the Jail's medical provider, CHMO, a subsidiary of CHC, was complying with its contract. Ms. Wyrick further made an ominous prognosis: "This is very serious, especially in light of the three cases we have now - what else will be coming? It is one thing to say we have a contract ... to cover medical services, it is another issue to ignore any and all signs we receive of possible [medical]

issues or violations of our agreement with [CHC] for [health] services in the jail. The bottom line is, the Sheriff is statutorily obligated to provide medical services."

56. NCCHC conducted a second audit of the Jail's health services program in 2010. After the audit was completed, the NCCHC placed the Tulsa County Jail on probation.

57. NCCHC once again found numerous serious deficiencies with the health services program. As part of the final 2010 Report, NCCHC found, *inter alia*, as follows: "The [Quality Assurance] multidisciplinary committee does not identify problems, implement and monitor corrective action, nor study its effectiveness"; "There have been several inmate deaths in the past year"; "The clinical mortality reviews were poorly performed"; "The responsible physician does not document his review of the RN's health assessments"; "the responsible physician does not conduct clinical chart reviews to determine if clinically appropriate care is ordered and implemented by attending health staff"; "diagnostic tests and specialty consultations are not completed in a timely manner and are not ordered by the physician"; "if changes in treatment are indicated, the changes are not implemented"; "When a patient returns from an emergency room, the physician does not see the patient, does not review the ER discharge orders, and does not issue follow-up orders as clinically needed"; and "potentially suicidal inmates [are not] checked irregularly, not to exceed 15 minutes between checks. Training for custody staff has been limited. Follow up with the suicidal inmate has been poor."

58. Former Sheriff Glanz only read the first two or three pages of the 2010 NCCHC Report. Former Sheriff Glanz is unaware of any policies or practices changing at the Jail in response to the 2010 NCCHC Report.

59. Over a period of many years, Tammy Harrington, R.N., former Director of Nursing at the Jail, observed and documented many concerning deficiencies in the delivery of health care services to inmates. The deficiencies observed and documented by Director Harrington include:

chronic failure to triage inmates' requests for medical and mental health assistance; a chronic lack of supervision of clinical staff; and repeated failures of medical staff to alleviate known and significant deficiencies in the health services program at the Jail.

60. On September 29, 2011, the U.S. Department of Homeland Security's Office of Civil Rights and Civil Liberties ("CRCL") reported its findings in connection with an audit of the Jail's medical system, pertaining to U.S. Immigration and Customs Enforcement ("ICE") detainees, as follows: "CRCL found a prevailing attitude among clinic staff of indifference"; "Nurses are undertrained. Not documenting or evaluating patients properly."; "Found one case clearly demonstrates a lack of training, perforated appendix due to lack of training and supervision"; "Found two detainees with clear mental/medical problems that have not seen a doctor."; "[Detainee] has not received his medication despite the fact that detainee stated was on meds at intake"; "TCSO medical clinic is using a homegrown system of records that 'fails to utilize what we have learned in the past 20 years'".

61. Director Harrington did not observe any meaningful changes in health care policies or practices at the Jail after the ICE-CRCL Report was issued.

62. On the contrary, less than 30 days after the ICE-CRCL Report was issued, on October 27, 2011, another inmate, Elliott Earl Williams, died at the Jail as a result of truly inhumane treatment and reckless medical neglect which defies any standard of human decency. A federal jury has since entered a verdict holding Sheriff Regalado liable in his official capacity for the unconstitutional treatment of Mr. Williams.

63. In the wake of the Williams death, which was fully investigated by TCSO, Former Sheriff Glanz made no meaningful improvements to the medical system. This is evidenced by the fact that yet another inmate, Gregory Brown, died due to grossly deficient care just months after Mr. Williams.

64. On November 18, 2011, AMS-Roemer, the Jail's own retained medical auditor, issued its Report to Former Sheriff Glanz finding multiple deficiencies with the Jail's medical delivery system, including "[documented] deviations [from protocols which] increase the potential for preventable morbidity and mortality." AMS-Roemer specifically commented on no fewer than six (6) inmate deaths, finding deficiencies in the care provided to each.

65. It is clear that Former Sheriff Glanz did little, if anything, to address the systemic problems identified in the November 2011 AMS-Roemer Report, as AMS-Roemer continued to find serious deficiencies in the delivery of care at the Jail. For instance, as part of a 2012 Corrective Action Review, AMS-Roemer found "[d]elays for medical staff and providers to get access to inmates," "[n]o sense of urgency attitude to see patients, or have patients seen by providers," failure to follow NCCHC guidelines "to get patients to providers," and "[n]ot enough training or supervision of nursing staff."

66. In November 2013, the Tulsa County Board of County Commissioners ("BOCC")/TCSO/Former Sheriff Glanz retained Armor Correctional Health Services, Inc. ("Armor") as its private medical provider. However, this step did not alleviate the constitutional deficiencies with the medical system. Medical staff was still undertrained and inadequately supervised and inmates were still denied timely and sufficient medical attention. Bad medical and mental health outcomes persisted due to inadequate supervision and training of medical staff, and due to the contractual relationship between BOCC/TCSO/Former Sheriff Glanz and Armor (which provided financial disincentives for the transfer of inmates in need of care to an outside facility).

67. In February 2015, an auditor/nurse hired by Tulsa County/TCSO, Angela Mariani, issued a report focused on widespread failures by Armor to abide by its $5 million annual contract with the County. Mariani also wrote three (3) memos notifying TCSO that Armor failed to staff

various medical positions in the Jail and recommending that the county withhold more than $35,000 in payments. Her report shows that Jail medical staff often failed to respond to inmates' medical needs and that Armor failed to employ enough nurses and left top administrative positions unfilled for months. Meanwhile, medical staff did not report serious incidents including inmates receiving the wrong medication and a staff member showing up "under the influence."

68. In approximately December 2016, the County/Sheriff Regalado retained Turn Key as the Jail's medical contractor. Turn Key's CEO, Flint Junod, was Armor's Vice President of the Jail's region during Armor's tenure as the Jail's private medical provider and he was aware of deficiencies in the medical care provided at the Jail prior to and at the time Turn Key was retained.

69. The County/Sheriff Regalado replaced Armor with Turn Key in large part because Angela Mariani had concluded, in October 2016, that "[s]ince Armor has been [the medical provider at the Jail] there have been significant issues with no improvement. I am concerned that we have seen the best they can offer because these issues have been addressed and no improvements made."

70. For a time in recent years, Defendant Turn Key was the largest private medical care provider to county jails in the state. Turn Key used its political connections to obtain contracts in a number of counties, including Tulsa County, Muskogee County, Garfield County, and Creek County. Turn Key now has contracts with county jails in over ten (10) states and with hundreds of counties.

71. Turn Key has demonstrated, over a period of years, that its medical delivery system and "plan" is dangerously deficient. At least by the time of Mr. Hogan's death, the County/TCSO knew, or should have known, that Turn Key's grossly deficient system and "plan" posed excessive risks to the health and safety of inmates, like Mr. Hogan, who suffer from serious and complex medical and mental health conditions.

72. To achieve net profits, Turn Key implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care service in a manner that would maintain or increase its profit margin.

73. There are no provisions in Turn Key's contract with the County (the "Contract") creating or establishing any mandatory minimum expenditure for the provision of Healthcare Services. The Contract incentivizes cost-cutting measures in the delivery of medical and mental health care service at the Jail to benefit Turn Key's investors in a manner that deprives inmates at the Jail of adequate medical care.

74. Under the Contract, Turn Key is responsible to pay the costs of all pharmaceuticals at the Jail up to a certain amount. If the annual pharmaceutical costs exceed this limit, TCSO/Tulsa County is responsible for the excess costs.

75. Similarly, Turn Key was responsible to pay the costs for all off-site medical services and hospitalizations up to a certain amount, and TCSO/Tulsa County was responsible for any excess costs of inmate hospitalizations and off-site medical care.

76. The Contract provided that Turn Key will arrange and bear the cost of hospitalization of inmates who, in the opinion of the Turn Key treating physician or medical director, require hospitalization, up to the agreed-upon limit.

77. These contractual provisions create a dual financial incentive to under-prescribe and under-administer medications and to keep inmates, even inmates with serious medical needs, at the Jail and to avoid off-site medical costs.

78. These financial incentives create risks to the health and safety of inmates like Mr. Hogan who have complex and serious medical and mental health conditions, such as cardiovascular disease, congestive heart failure, chronic obstructive pulmonary disease, and severe mental illness.

79. In bidding for contracts with other counties, Turn Key boasts of its ability to save costs,

specifically citing Tulsa County. Indeed, in bidding for other counties, Turn Key asserts:

> According to statistics maintained by the facility, ***Tulsa County experienced a 77% reduction in monthly emergency room transfers and a 35% reduction in monthly hospital days*** within the first few months of Turn Key replacing Armor's program. To further highlight our success, the ***annual offsite expenditures have remained well below the established Aggregate CAP since we started our contract. This is an accomplishment that had not been realized for at least 4 years prior to Turn Key taking over the program!***
>
> In addition to the cost savings associated with fewer hospital claims, Tulsa County experienced additional cost savings in the form of the reduced need for offsite security personnel. On average, TCSO was able to reallocate an average of 585 man-hours per month to other security functions as opposed to ER and hospitalization security duty. Even with a conservative estimate, ***we believe our program allowed for an annual reduction of more than $175,000 of excessive offsite security pay***.

80. Turn Key has no protocol or clear policy with respect to the medical monitoring and care of inmates with complex or serious medical needs, and provides no guidance to its medical staff regarding the appropriate standards of care with respect to inmates with complex or serious medical needs, including cardiovascular disease, congestive heart failure, chronic obstructive pulmonary disease, and severe mental illness.

81. Specifically, Turn Key has an established practice of failing to adequately assess and treat, and ignoring and disregarding, obvious or known symptoms of emergent and life-threatening conditions.

82. These failures stem from the chronic unavailability of an on-site physician, financial incentives to avoid the costs of inmate prescription medications and off-site treatment, and a failure to train and supervise medical staff in the assessment and care of inmates with complex or serious medical or mental health needs, including cardiovascular disease, congestive heart failure, chronic obstructive pulmonary disease, and severe mental illness.

83. Like the Jail's previous medical providers, Turn Key has an established policy, practice,

and/or custom of allowing undertrained and under-supervised LPNs and mid-level providers to provide medical assessments, monitoring and care, and to, *de facto*, run the medical unit at the Jail, well outside the scope of their licensure and practice.

84. Turn Key's inadequate or non-existent policies and customs were a moving force behind the constitutional violations and injuries alleged herein.

85. Decisions related to the assessment and treatment of Mr. Hogan were largely made by LPNs, LPCs, and a mid-level provider, without clinical supervision by a physician, who failed to refer Mr. Hogan to a physician.

86. Indeed, Mr. Hogan was never assessed by a physician at the Jail, and his serious cardiovascular and respiratory conditions were left to be monitored, if at all, by nursing staff.

87. Turn Key's corporate policies, practices and customs as described *supra*, have resulted in deaths or negative medical outcomes in countless cases in both Tulsa County and across the country, in addition to Mr. Hogan's.

88. These other cases bear numerous similarities. Indeed, in most of the deaths and negative outcomes at jails in which Turn Key is the medical provider, there exist some variation of the following circumstances: 1) Turn Key employees ignoring or failing to address the symptoms and concerns reported to them; 2) non-medical professionals, including jailers or other inmates, pleading with Turn Key employees to further assess or treat inmates; 3) inmates begging Turn Key employees to take them to the hospital; 4) inmates complaining of symptoms of a serious medical condition for hours; 5) inmates manifesting visible symptoms of a serious medical condition for hours; 6) Turn Key employees being aware of inmates' medical histories and ignoring symptoms related to those histories; 7) Turn Key employees failing to administer inmates' prescribed medications to them as directed or at all; 8) Turn Key employees delaying in getting inmates assessed by a physician, leading to their suffering and deaths; and/or 9) Turn Key employees

delaying in hospitalizing inmates, leading to their suffering and deaths.

89. For instance, in November 2014, while detained at the Cleveland County Jail, Robert Allen Autry developed a sinus infection. Both he and his mother informed Turn Key medical staff that a traumatic brain injury he suffered as a teenager made him particularly susceptible to sinus infections causing life-threatening brain infections. Mr. Autry and his mother repeatedly asked medical staff to provide antibiotics, but none were provided.

90. Approximately two weeks after she initially contacted medical staff about her son's condition and need for care, Turn Key staff called Mr. Autry's mother asking her to provide written consent for Mr. Autry to receive emergency surgery.

91. He had been found unconscious in his cell and had been transported to the hospital. Later the same day, Mr. Autry was diagnosed with "a serious bacterial infection in his brain as a result of an untreated sinus infection." Mr. Autry underwent emergency brain surgery and subsequently a series of other operations and procedures to place a feeding tube, insert a tracheal tube, and replace a cranial monitoring probe.

92. Eventually, the treating physician determined Mr. Autry "was totally incapacitated from a brain injury resulting from a brain abscess and subdural empyema" and "would likely never return to an independent state."

93. In June 2016, a nurse who worked for Turn Key at the Garfield County Jail allegedly did nothing to intervene while a hallucinating man was kept in a restraint chair for more than 48 hours. That man, Anthony Huff, ultimately died restrained in the chair. Mr. Huff's estate reached a settlement with Garfield County for $12,500,000 and a confidential settlement with Turn Key. Upon information and belief, Turn Key employees were criminally charged in connection with their treatment of Mr. Huff.

94. An El Reno man died in 2016 after being found naked, unconscious and covered in his

own waste in a cell at the Canadian County Detention Center, while ostensibly under the care of Turn Key medical staff. The Office of the Chief Medical Examiner found the man had experienced a seizure in the days before his death.

95. A man in the Creek County Jail, also under the purported "care" of Turn Key, died in September 2016 from a blood clot in his lungs after his repeated complaints, over several days, of breathing problems were disregarded by responsible staff, and he lost consciousness.

96. Another man, Michael Edwin Smith, encountered deliberate indifference to his serious medical needs at the Muskogee County Jail in the summer of 2016. Mr. Smith became permanently paralyzed when the jail staff failed to provide him medical treatment after he repeatedly complained of severe pain in his back and chest, as well as numbness and tingling. Smith claims that cancer spread to his spine, causing a dangerous spinal compression, a condition that can cause permanent paralysis if left untreated. Smith asserts that he told the Turn Key-employed physician at the jail that he was paralyzed, but the physician laughed at Smith and told him he was faking. For a week before he was able to bond out of the jail, Smith was kept in an isolation cell on his back, paralyzed, unable to walk, bathe himself or use the bathroom on his own. He lay in his own urine and feces because the jail staff told Smith he was faking paralysis and refused to help him.

97. In November of 2016, Muskogee County Jail and Turn Key staff disregarded, for days, the complaints and medical history of inmate James Douglas Buchanan. As noted by Clinton Baird, M.D., a spinal surgeon:

> [Mr. Buchanan] is a 54-year-old gentleman who had a very complicated history… [H]e was involved in being struck by a car while riding bicycle several weeks ago. … ***He ended up finding himself in jail and it was during this time in jail that he had very significant clinical deterioration in his neurologic status. [I]t is obvious that he likely developed the beginnings of cervical epidural abscess infection*** in result of his critical illness [and] hospitalization, but then

> ***while in jail, he deteriorated significantly and his clinical deterioration went unrecognized and untreated until he was nearly completely quadriplegic.***

(emphasis added).

98. On September 24, 2017, a 25-year-old man named Caleb Lee died in the Tulsa County Jail after Turn Key medical staff, in deliberate indifference to Mr. Lee's serious medical needs, provided nearly nonexistent treatment to Mr. Lee over a period of 16 days. Mr. Lee was not seen by a physician in the final six (6) days of his life at the Tulsa County Jail (and only once by a psychologist during his entire stay at the jail), despite the fact that other Turn Key staff noted that he was suffering from: tachycardia, visible tremors, psychosis, symptoms of delirium, stage 2 hypertension, paranoia, and hallucinations. Turn Key staff failed to transfer Mr. Lee to an outside medical provider despite these obviously serious symptoms that worsened by the day until Mr. Lee's death on September 24, 2017. Mr. Lee's estate brought claims, pursuant to 42 U.S.C. § 1983, against Sheriff Regalado, in his official capacity, Turn Key, and employees of Turn Key. Mr. Lee's estate ultimately reached a confidential settlement in 2022. *See Lee v. Turn Key Health Clinics, LLC, et al.,* Case No. 19-CV-318-GKF-JFJ (N.D. Okla.).

99. As with Mr. Hogan, no physician saw Mr. Lee in the week before his death, despite the fact that his symptoms and conditions, including hypertension, bipolar disorder, and hallucinations, continued to deteriorate.

100. In January 2018, Marconia Kessee died of drug toxicity in the Cleveland County Jail after Turn Key wholly failed to take any actions, including performing a medical intake evaluation, in response to profuse sweating, inability to walk, incoherent speech, and seizure-like convulsions of Mr. Kessee and instead put him in a cell where he died within hours. Cleveland County Jail jailers were aware of the same symptoms and performed wholly inadequate, less than one-second-long sight checks of Mr. Kessee throughout the last hours of his life. Turn Key staff did not even perform

a single sight check of Mr. Kessee during the time he lay dying, until he was found completely unresponsive.

101. In November 2018, Misty Bailey, a pretrial detainee at the Ottawa County Jail, began to suffer from severe chest pain and elevated heart rate. She eventually started vomiting, could not hold down any food or medications, and also began experiencing lower back pain and severe pain when urinating. Despite being informed of these symptoms, Turn Key medical staff refused to assess Ms. Bailey or send her to a hospital. For two days Ms. Bailey continued to deteriorate, eventually experiencing a fever of 103 degrees and a seizure, at which point detention staff informed Ms. Bailey she would be taken to a hospital only if she agreed to be released on her own recognizance and assume financial responsibility for her medical care.

102. At the hospital, Ms. Bailey was diagnosed with a bacterial urinary tract infection that had progressed to her kidney. In its Order denying Turn Key's motion to dismiss, this Court emphasized that *Monell* liability is adequately alleged at the pleading stage where a plaintiff points to comparable instances at other facilities operated by Turn Key: "Plaintiff cites numerous instances at other prison medical facilities operated by Turn Key in which medical care was inadequate or denied altogether, and she alleges that the poor medical care is the result of a custom or policy of Turn Key to cut costs and prioritize financial gain over the delivery of constitutionally adequate medical care. At the pleading stage, the Court finds that plaintiff's allegations are sufficient to support an inference that plaintiff was denied medical care for serious condition due to an official policy or custom, and Turn Key's motion to dismiss should be denied." *Bailey v. Turn Key Health Clinics, LLC*, No. 20-CV-0561-CVE-SH, 2021 U.S. Dist. LEXIS 177310, at *18-19 (N.D. Okla. Sept. 17, 2021). The case settled confidentially and a stipulation of dismissal was filed on December 10, 2021.

103. On September 6, 2019, Dunniven Phelps was booked into the Tulsa County Jail.

104. During the book-in process, on September 6 at approximately 7:35 p.m., Turn Key employee/agent Richard Dutra filled out an Intake Screening form. Pertinently, the Intake Screening form indicates that Mr. Phelps was being treated for hypertension (high blood pressure) at the time and had been prescribed medication by his physician to treat the condition. During the intake screening process, Mr. Dutra further documented that Mr. Phelps was diabetic and had previously been diagnosed with mental health conditions.

105. During the medical intake process, Mr. Phelps complained that he had a severe headache, neck pain, and blurry vision, which are common symptoms of a stroke.

106. Despite the fact that Mr. Phelps told Mr. Dutra about his current symptoms and history of hypertension, Mr. Dutra recommended that Mr. Phelps be placed in general population and that he did not need a referral for a continuity of care plan.

107. Throughout the night of September 6, 2019, Mr. Phelps' symptoms significantly worsened, as he was obviously suffering from a stroke.

108. By the morning of September 7, Mr. Phelps was experiencing severe weakness on the entire left side of his body, leaving him barely able to walk, as his left leg was almost completely numb.

109. At approximately 9:37 a.m. on September 7, Turn Key Nurse Patty Buchanan "assessed" Mr. Phelps, who told her that he could hardly feel or move the left side of his body and his other symptoms, such as dizziness and blurred vision, were worsening. Nurse Buchanan recorded Mr. Phelps' blood pressure as 163/103, which the American Heart Association classifies as Stage 2 hypertension.

110. Nurse Buchanan failed to inform a physician or even an RN or Nurse Practitioner about Mr. Phelps' alarming symptoms and worsening condition, in deliberate indifference to his serious medical needs.

111. Further, while Nurse Buchanan allegedly counseled Mr. Phelps on the importance of taking his medications, there is no evidence that she, or anyone else at TCSO/Turn Key, ***ever gave Mr. Phelps any medications during his time at the Jail.***

112. On one occasion, when Mr. Phelps could not get off of the ground because he could not use his left leg or left arm, a detention officer ("DO") threatened to "Taze" Mr. Phelps if he didn't get off the ground.

113. Mercifully, an inmate who was an amputee let Mr. Phelps use his wheelchair so that he could try to get an actual medical assessment and treatment at the medical unit of the Jail.

114. At approximately 2:19 p.m. on September 7, a DO finally agreed to wheel Mr. Phelps to the medical unit, where he was seen by Nurse Gann.

115. Shockingly, Nurse Gann thought Mr. Phelps was faking his emergent condition. Jail surveillance video shows Mr. Phelps lying on the ground in the medical unit, unable to walk, stand, or effectively use his arms, while Nurse Gann drops a piece of paper onto his face, presumably because she thought Mr. Phelps would move out of the way if he was capable of moving. Nurse Gann and other Turn Key personnel left Mr. Phelps lying on the floor, helpless and in immeasurable pain.

116. At 4:05 p.m. on September 7, Mr. Phelps was finally seen by Elizabeth Martin, Advanced Practice Registered Nurse ("APRN").

117. APRN Martin noted that Mr. Phelps had a ***"3 day history of evolving stroke like symptoms."*** She also noted that Mr. Phelps' "speech [was] slurred" and that he had "left side facial droop" and weakness on his left side. By this time, Mr. Phelps' blood pressure was 183/114, which is considered a ***hypertensive crisis that requires immediate consultation and assessment by a physician.***

118. Phelps was finally sent to Hillcrest Medical Center at approximately 6:15 p.m. on

September 7, 2019.

119. Once at Hillcrest, Mr. Phelps was transferred to the Intensive Care Unit ("ICU") where physicians provided emergent, life-saving treatment.

120. Unfortunately, the delay in treating Mr. Phelps, due to Turn Key and Jail staff's deliberate indifference, resulted in Mr. Phelps suffering permanent damage.

121. Mr. Phelps is now permanently paralyzed on the entire left side of his body and will require significant medical treatment for the rest of his life.

122. Mr. Phelps brought claims, pursuant to 42 U.S.C. § 1983, against Sheriff Regalado, in his official capacity, Turn Key, and employees of Turn Key. Mr. Phelps ultimately reached a confidential settlement in 2024. *See Phelps v. Buchanan, et al.,* Case No. 21-CV-365-GKF-JFJ (N.D. Okla.).

123. From June to October 2019, Bryan Davenport, an inmate at the Cleveland County Jail, was denied adequate medical care by Turn Key personnel. Mr. Davenport informed Turn Key staff that he had hypertension and HIV, yet he was not seen by a physician, physician's assistant, or nurse practitioner for nearly a month after his arrival at the jail. When a Turn Key nurse finally saw Davenport, she told him that she did not want to start treatment pertaining to his HIV and left him without vital medications for several months. Turn Key also refused to treat Davenport under their "chronic care" protocol, instead requiring him to submit multiple sick calls just to attempt to get his medications so that Turn Key and Cleveland County could charge Davenport $15/visit.

124. In October-November 2020, an inmate at the Cleveland County Jail slowly died of his known congestive heart failure as Turn Key and its employees ignored the obvious and severe worsening of his condition, including extreme edema and swelling, fluid leaking from his legs, urinary incontinence, and clear signs of infection. Turn Key staff failed to properly assess, evaluate,

or treat the inmate and failed to refer him to a more highly trained provider or an outside medical provider.

125. In July 2021, an inmate named Perish White died of COVID-19, which he contracted in the Creek County Jail. Mr. White began feeling ill on or about July 5, 2021, and reported his symptoms to Turn Key staff. From July 5 to July 16, 2021, Turn Key staff never once took Mr. White's vital signs, despite his repeated complaints that he was seriously ill, his obvious symptoms, and the fact that COVID-19 was raging through the Creek County Jail. On July 19, 2021, Mr. White was finally taken to OSU Medical Center in Tulsa for COVID-19 and respiratory failure, where he was placed on life support. Mr. White died on July 30, 2021.

126. On April 13, 2021, Christa Sullivan died at the Oklahoma County Jail ("OCJ"), which also uses Turn Key as its jail medical provider. Ms. Sullivan had a history of severe mental illness, and throughout her time at OCJ she exhibited extremely serious symptoms, including multiple instances of self-harm, suicidal ideation, a refusal to eat or drink, rapid weight loss, and catatonia. Approximately two months before Ms. Sullivan's death, numerous Turn Key providers, including nurses and two physicians, acknowledged Ms. Sullivan's emergent conditions and the fact that it was impossible for Ms. Sullivan to receive the life-saving care she needed in a jail setting. In fact, one Turn Key physician noted, with respect to Ms. Sullivan:

> ***DEPRESSED AFFECT, SEVERE ADULT FAILURE TO THRIVE. SEEMS AT HIGH RISK FOR POOR OUTCOME. I HAVE DISCUSSED HER CASE WITH PSYCHE, NURSING, AND WOUND CARE AND DO NOT SEE ANY LIKELY TO SUCCEED INTERVENTIONS IN THIS SETTING. SHE DOES NOT SEEM COMPETENT BY ANY BEHAVIORAL PARAMETER THAT I CAN SEE. WILL REDISCUSS OPTIONS WITH DR. CUKA AND DR. COOPER.***

Yet Turn Key providers allowed Ms. Sullivan to languish in her cell for months, catatonic and barely eating, until her eventual death.

127. After Ms. Sullivan's death, Kevin Wagner, a Captain at OCJ told an investigator, "[Ms.

Sullivan] went from 148 when she got here to … ***she looks like a skeleton."*** Captain Wagner also told the investigator he helped get Ms. Sullivan to a local hospital for a week at one point "because I felt that ***medical (in the Jail) wasn't providing her care enough."***

128. Another staff member told an investigator that Ms. Sullivan deteriorated ***"to a bag of bones."***

129. On June 12, 2021, Joseph Stewart was booked into the Cleveland County Jail.

130. On June 13, 2021, Mr. Stewart advised a Jail detention officer and Turn Key Nurse Angela Albertson, LPN, that he needed to go to the hospital because his arm had been hurting since the day of his arrest and because he had an L1 (lumbar vertebrae) fracture that was hurting.

131. Responsible Jail and Jail medical staff did nothing other than instruct Mr. Stewart to "not lay on his right side and rest arm."

132. Two hours later, Mr. Stewart advised Turn Key Nurse Sarah Garcia, LVN, of his arm and back pain.

133. In response, Mr. Stewart was moved to a bottom bunk. Nurse Garcia did not alert any other medical provider of Mr. Stewart's condition, complaints, or her decision making.

134. On June 17, 2021, Nurse Albertson responded to a sick call placed by Mr. Stewart. Nurse Albertson noted that Mr. Stewart had increased pain and reduced range of motion in his left arm and a belief that it might be associated with his back.

135. On June 19, 2021, Turn Key LPN Amanda Stehr observed Mr. Stewart "laying on the …floor" in distress with a pain rating of 10/10. She charted that Mr. Stewart asked "multiple times" to be transported to the hospital, that he was experiencing the worst pain he had ever been in and he could not handle it."

136. In response, Nurse Stehr called a Turn Key NP, ***whose only action was to prescribe an 800 mg ibuprofen, despite Mr. Stewart's obviously serious – and steadily***

***worsening – symptoms and condition.***

137. On June 21, 2021, Turn Key CRNP Becky Pata was informed that Mr. Stewart had fractured his L1 approximately three months previously, that he had experienced right shoulder pain since booking, and that he had a history of herniated discs.

138. Pata observed Mr. Stewart limping and "obviously in a great deal of pain" before charting that she would "send to ER out of abundance of caution."

139. After being transported to Norman Regional Hospital ("NRH"), Mr. Stewart's L1 compression fracture was confirmed.

140. Mr. Stewart was returned to the Jail after his short visit to the NRH ER.

141. On June 30, 2021, Mr. Stewart reported to Pata that he didn't feel well. He was taken back to NRH to be evaluated for pneumonia. Mr. Stewart reported symptoms including shortness of breath and unilateral leg swelling for the past month. After treating and discharging Mr. Stewart, NRH provided discharge instructions to the Jail and Turn Key that Mr. Stewart needed to return to the hospital in the event of "worsening symptoms or any symptoms of concern," "trouble breathing," or any "new symptoms or other concerns."

142. On July 4, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key Nurse Kariuki: 1) chest pain of 10/10; and 2) spitting up blood. Nurse Kariuki observed that Mr. Stewart appeared to be in distress with "reddish-green mucous…in the toilet."

143. In response to these alarming (and new) symptoms, Kariuki did nothing other than click a preformatted box suggesting that she instructed him to "increase fluids, medication use, follow-up sick call if no improvement."

144. Upon information and belief, Nurse Kariuki failed to report these symptoms to a physician, NP, PA, or RN, despite being aware of NRH's discharge instructions.

145. On July 5, 2021, Mr. Stewart reported to Nurse Albertson additional worsening or new

conditions, including difficulty breathing and persistent coughing.

146. In response to these new symptoms/worsening condition, Nurse Albertson did nothing other than instruct Mr. Stewart to "take good deep breaths so as not to get pneumonia."

147. On July 7, 2021, Mr. Stewart reported to CRNP Pata that he now was coughing up blood streaked sputum and had heartburn.

148. Pata, despite having knowledge of the NRH discharge instructions, did not contact a physician or the hospital and merely ordered omeprazole and prednisone for Mr. Stewart.

149. On July 14, 2021, Mr. Stewart reported the following worsening or new conditions to Turn Key LPN Christina Meza: 1) "woke up with blood dripping down the side of my face"; 2) pale-looking appearance; 3) persistent coughing; and 4) "leaning forward to breathe with hands on knees."

150. Meza did nothing other than order Guaifenesin, a generic cough medicine. She did not report Mr. Stewart's condition to a physician or the hospital despite knowing of NRH's discharge instructions.

151. Within an hour of Mr. Stewart's complaint to Meza, Turn Key and Jail staff allowed Mr. Stewart's release without disclosing the extent of his medical condition. Mr. Stewart was released to the custody of a deputy from Kingfisher county at approximately 7:59 p.m.

152. No one informed the Kingfisher deputy of Mr. Stewart's emergent condition or NRH's orders to bring Mr. Stewart back to the hospital if he had new or worsening symptoms.

153. Upon arrival at the Kingfisher Jail, approximately 60 miles from Norman, the medical staff at the Kingfisher Jail refused to admit Mr. Stewart based on his dire medical condition.

154. The transporting deputy then took Mr. Stewart to a local hospital before he was transferred to a hospital in Enid where he died the following day, July 15, 2021.

155. Mr. Stewart died due to acute bacterial endocarditis, acute respiratory failure, congestive

heart failure, and hyponatremia.

156. On August 3, 2021, Gregory Neil Davis was arrested and transported to the OCJ in the midst of an obvious mental health crisis. Mr. Davis was seen only by a Turn Key licensed professional counselor on two occasions, who noted signs of psychosis but made no treatment recommendations and took no action, including taking vital signs or referring Mr. Davis to a higher-level provider. For at least the final few days of his life, inmates in nearby cells heard Mr. Davis beating at his cell door, crying, and begging for medical help, but no one came to assist him. Mr. Davis was never seen by a Turn Key physician nor referred to an outside medical provider until the day of his death, when it was far too late. Mr. Davis died of a perforated duodenal ulcer, a condition that does not normally result in death unless left untreated for a substantial period of time.

157. In August 2021, Larry Price, an intellectually disabled, 55-year-old inmate at the Sebastian County (Arkansas) Adult Detention Center, starved to death after responsible jail and Turn Key personnel failed to properly treat his medical and mental health conditions, including schizophrenia, for a year. The six foot, two inch Mr. Price entered the jail weighing approximately 185 pounds. By the time he was found unresponsive in his cell 366 days later, he weighed 90 pounds according to EMS reports. For over a year, Turn Key personnel watched as Mr. Price deteriorated both physically and mentally, doing nothing to assess, evaluate, or treat his conditions, and never referring Mr. Price to an outside medical provider.

158. On December 24, 2021, Dean Stith, a 55-year-old man, was booked into the Tulsa County Jail. Mr. Stith suffered from numerous pre-existing medical and mental health conditions, including hypertension, bipolar disorder and/or schizophrenia, and serious dementia, which was obvious even to a layperson. Mr. Stith's condition deteriorated throughout his stay at the Jail, and despite alarming symptoms, including slurred speech, diminished skin turgor, pitting edema, full

body weakness, and an inability to urinate, Turn Key providers, none of whom were physicians, failed to call for an ambulance or ensure that Mr. Stith was urgently evaluated by a physician. Mr. Stith was found unresponsive on January 10, 2022, and passed away after being transferred to St. John Medical Center. The Office of the Chief Medical Examiner of Oklahoma determined that Mr. Stith died due to acute bronchopneumonia due to complications of COVID-19, and hypertensive atherosclerotic cardiovascular disease. Mr. Stith's estate brought claims, pursuant to 42 U.S.C. § 1983, against Sheriff Regalado, Turn Key, and employees of Turn Key. *See Crawford v. Turn Key Health Clinics, LLC, et al.*, 24-CV-6-JDR-SH (N.D. Okla.). On July 8, 2025, this Court denied the *Crawford* defendants' motions to dismiss. *See Crawford v. Turn Key Health Clinics, LLC, et al.*, 24-CV-6-JDR-SH (N.D. Okla. July 8, 2025).

159. In denying defendant Turn Key's motion to dismiss with respect to Ms. Crawford's municipal liability claim, the *Crawford* Court held and reasoned that 1) Ms. Crawford sufficiently alleged constitutional violations by Nurse Lewis and Nurse Higler, both of whom are Turn Key employees; 2) Turn Key has implemented policies, procedures, customs, or practices to reduce the cost of providing medical and mental health care to increase profits; and 3) these policies, procedures, customs, or practices caused Mr. Stith's injuries. In denying defendant Regalado's motion to dismiss, the *Crawford* Court further held that Ms. Crawford identified several policies, including keeping patients onsite for care, inadequate staffing, lack of access to a physician, and failure to train or supervise, that may have been a moving force behind Mr. Stith's asserted constitutional violations.

160. On December 8, 2022, Shannon Hanchett, a 38-year-old mother of two, died at the Cleveland County Jail.

161. Ms. Hanchett was a mother of two boys and a pillar of the local community. She was the owner of Norman's Cookie Cottage, a well-known and popular bakery in Norman, OK.

162. Ms. Hanchett had a bachelor's degree and a master's degree in Human Relations from the University of Oklahoma. She began her career helping children at the Oklahoma Department of Mental Health and Substance Abuse Services, where she worked for almost a decade advocating for mental health care. Tragically, she would later find herself in the same position as the vulnerable people she had passionately tried to help.

163. In October of 2022, Ms. Hanchett went to the hospital for severe headaches, but a CT scan found no abnormalities. A few weeks later, she began to exhibit signs of mental illness consistent with bipolar disorder and/or schizophrenia. She had no prior history of mental illness.

164. The following month, Ms. Hanchett began to hallucinate and became convinced that her husband of 17 years, Daniel, had tapped the cell phone he had recently bought for her.

165. On the evening of November 26, 2022, Ms. Hanchett entered an AT&T Wireless store in Norman, hoping to buy a new cell phone. While in the store, she exhibited obvious signs of psychosis.

166. Clearly confused, distressed, and suffering from delusions, Ms. Hanchett asked a store employee to call 911, and a Norman Police Department ("NPD") Officer responded to the scene.

167. The Officer acknowledged that Ms. Hanchett appeared to be exhibiting behavior consistent with a mental health disorder. Nevertheless, he arrested Ms. Hanchett for misdemeanor obstruction and transported her to the Cleveland County Jail. Video from the officer's body-worn camera shows that Ms. Hanchett is disoriented and terrified at the prospect of being arrested.

168. Ms. Hanchett had no criminal history. This was her first time in a detention facility. She was a pretrial detainee.

169. Jail surveillance video shows Ms. Hanchett's mental health status, which could conservatively be described as acute psychosis, continued to deteriorate after arriving at the Jail.

170. Turn Key nurse Danille Hay, LPN, began the medical intake process with Ms. Hanchett

but later claimed she was unable to complete it due to Ms. Hanchett's ongoing and severe mental health crisis.

171. Nurse Hay *was* able to chart, however, that Ms. Hanchett suffered from lupus and bipolar disorder.

172. Nurse Hay also took Ms. Hanchett's vital signs. Her blood pressure (143/89) and pulse (120 BPM) were both elevated. Nurse Hay did not, however, take any steps to address these concerning vital signs.

173. Nurse Hay later charted that Ms. Hanchett had been "uncooperative" during processing and that she'd been unable "to complete [intake] at this time." However, in a written report, Officer David Owen notes that Ms. Hanchett "appears to cooperate with officers while being processed as a new inmate."

174. After failing to complete the intake process, Jail staff locked Ms. Hanchett in processing cell B130 – a tiny, cockroach-infested cell that had no sink, no toilet and no bed. For the next 11 days, she was confined in these conditions and deprived of virtually all human contact. The lights were left on at all times, day and night, depriving her of any sleep.

175. For periods of up to 5 days at a time, no one at the Jail even opened the door of Ms. Hanchett's cell. Denied access to a toilet, she was forced to urinate on the floor and then lie in her own waste.

176. Despite the absence of a sink in her cell, no one at the Jail provided her with water or other hydration, day after day after day.

177. Throughout this time, the Jail and Turn Key staff were fully aware of Ms. Hanchett's dreadful conditions of confinement and her escalating mental health crisis.

178. Ms. Hanchett's cell was video monitored, allowing Jail staff to clearly see her extreme distress, her erratic behavior, and the rotting food, trash, and human waste on the floor of her cell.

Despite observing that Ms. Hanchett had not been adequately eating and had been given nothing to drink for days, they failed to address these dangerous health risks or report them to a physician. This constitutes deliberate indifference, reckless neglect and inhumane mistreatment across the board. Indeed, Ms. Hanchett was shown *nothing but* indifference during her time at the Cleveland County Jail.

179. After 12 unspeakably horrific days at the Cleveland County Jail, Ms. Hanchett died.

180. The Medical Examiner's office determined Ms. Hanchett died of heart failure. Other significant conditions contributing to her death were psychosis with auditory and visual hallucinations and severe dehydration.

181. On information and belief, Ms. Hanchett's death would not have occurred in the absence of her prolonged catatonia and severe dehydration.

182. In 2026, Ms. Hanchett's estate reached a settlement agreement with Cleveland County for $20,000,000. Ms. Hanchett's estate's claims against Turn Key are ongoing.

183. On July 22, 2022, William Wimbley, a 64-year-old man, was booked into the McCurtain County Jail, another facility that relied on Turn Key to provide medical services. Mr. Wimbley suffered from chronic hypertension and, for months, complained that the Jail and Turn Key staff were not properly controlling his blood pressure. Contrary to hospital discharge instructions, Turn Key staff repeatedly failed to return Mr. Wimbley to a hospital or have him seen by a physician even as his blood pressure remained at hypertensive-crisis levels and he developed left-sided weakness and numbness. On April 5, 2023, after months of indifference, Mr. Wimbley was finally sent to a hospital where it was determined he had suffered a stroke. Mr. Wimbley brought suit, pursuant to § 1983, against the McCurtain County Jail Trust, the McCurtain County Board of County Commissioners ("BOCC"), and Turn Key. *See Wimbley v. McCurtain County Jail Trust, et al.*, Case No. 25-CV-78-RAW-GLJ (E.D. Okla.). On August 29, 2025, Magistrate Judge Gerald

Jackson issued a Report and Recommendation recommending the denial of Defendants Turn Key's and BOCC's motions to dismiss, holding that Mr. Wimbley's "allegations sufficiently support an inference that [Mr. Wimbley] was denied medical care for his serious medical condition due to an official policy or custom."

184. On February 19, 2022, China Bradley, a 24-year-old woman who suffered from paranoid schizophrenia, bipolar disorder, anxiety, and dissociative identity disorder, was booked into the Tulsa County Jail. Ms. Bradley's mental and physical condition deteriorated over the following months.

185. On December 7, 2022, Ms. Bradley admitted to seeing things that weren't there and hearing voices. Turn Key provider Judy Wagga observed Ms. Bradley to be trembling. Ms. Bradley was then started on Benztropine Mesylate, a medication used to treat Parkinson's Disease.

186. On or about December 16, 2022, Ms. Bradley reported to Turn Key LPC Taylor that she felt sick and was throwing up. LPC Taylor observed that Ms. Bradley had recently been noncompliant with her medications, which was unusual for her, and also that Ms. Bradley had moved her mattress onto the floor of her cell, which was out of character.

187. In the following days, Ms. Bradley began to experience symptoms of a serious medical condition. She began to feel faint, fatigued, and her vision would randomly become blurry. Upon information and belief, she also stopped eating regularly, which was unusual for her. She spent nearly every minute of each day lying naked on the floor of her cell, rarely responding to Jail or medical personnel and responding only to internal stimuli.

188. On the morning of December 21, 2022, Ms. Bradley was taking a shower when she began to feel faint and her vision became blurry. She fainted, fell down, and hit her head on the wall, causing a golf ball-sized "goose egg" on her forehead. Ms. Bradley was not sent to the hospital or

evaluated by a physician after her fall, which was caused by new and serious symptoms of a serious medical condition.

189. In the afternoon of December 21, 2022, Ms. Bradley was observed to be in an even deeper psychosis and she refused to engage with LPC Taylor or other mental health professionals.

190. Ms. Bradley's recently worsening symptoms, including severe fatigue, feeling faint, blurry vision, sudden refusal to eat, worsening psychosis, trouble standing and walking, and falls should have triggered an emergent evaluation by a physician, either at the Jail or at an offsite hospital, but, in deliberate indifference to her serious medical needs, Ms. Bradley received no additional treatment beyond her psychotropic medications, which were obviously not working.

191. The morning of December 22, 2022, Turn Key certified medication aide ("CMA") Carissa Hemphill encountered Ms. Bradley during med-pass. Ms. Bradley refused her medications because, according to the delusional and psychotic Ms. Bradley, the medications were for a woman, but she was a man. Ms. Bradley then began inappropriately discussing her breasts with CMA Hemphill. Ms. Bradley was still not sent for an emergent evaluation by a physician or provided any additional treatment.

192. Upon information and belief, after the December 21 fall, Ms. Bradley experienced great difficulty walking or standing by herself without falling.

193. On December 23, 2022, at approximately 6:05 p.m., LPC Taylor encountered Ms. Bradley on mental health rounds. Ms. Bradley was delusional, not oriented in time or place, hadn't eaten her last several meals, and exhibited the signs of a serious medical condition that she had been experiencing for the previous week or so, including severe fatigue, trouble standing or walking, and worsening psychosis. Ms. Bradley was found to be responding to internal stimuli and believed that LPC Taylor was one of her parents. Yet, again, Ms. Bradley was still not sent for an emergent evaluation by a physician or provided any additional treatment.

194. Upon information and belief, sometime after LPC Taylor left Ms. Bradley's cell, ***Ms. Bradley fell – again – and hit her head***.

195. At approximately 9:05 p.m. on December 23, 2022, TCSO Deputy Allison discovered Ms. Bradley lying on the floor of her cell unresponsive. She had no pupil response, was bleeding from her left eye, and could not stand or walk. Despite Ms. Bradley's second serious ***documented*** fall in two days, in conjunction with her other worsening symptoms, she was not immediately evaluated by a physician or provided additional treatment.

196. It was not ***until 11:00 p.m. – nearly two hours after Ms. Bradley was found unresponsive after having fallen again – that she was transported to the St. John Emergency Room***.

197. The EMSA paramedics noted that Ms. Bradley had a history of psychiatric problems but since falling, she had not been normal.

198. Upon arrival at St. John, the ER physician noted, according to EMSA, Ms. Bradley had a history of "multiple falls over the past week." The physician further noted that Ms. Bradley exhibited confused speech.

199. Ms. Bradley's blood was taken at the ER and the lab results revealed that she was suffering from lactic acidosis[1] and hypokalemia.[2] Ms. Bradley's potassium level of 2.6 mmol/L is considered

---

[1] Lactic acidosis is a buildup of lactic acid in the bloodstream, which occurs when the body produces too much lactic acid and/or can't metabolize enough of the lactic acid it produces, typically because of kidney and/or liver failure. Persistent lactic acidosis suppresses cardiac output and can lead to organ failure and death. *See* Cleveland Clinic, *Lactic Acidosis,* https://my.clevelandclinic.org/health/diseases/25066-lactic-acidosis, last accessed 12/19/24.

[2] Hypokalemia means low blood potassium levels. Normal potassium levels range from 3.5 to 5.2 mmol/L. Symptoms of mild low potassium may cause symptoms such as constipation, heart palpitations, extreme fatigue, muscle weakness and spasms, and tingling or numbness. Symptoms of severe hypokalemia include severe muscle weakness, low blood pressure, lightheadedness or faintness, abnormal heart rhythms, excessive urination and excessive thirst. *See* Cleveland Clinic, *Hypokalemia, https://my.clevelandclinic.org/health/diseases/17740-low-potassium-levels-in-your-blood-hypokalemia*, last accessed 12/19/24.

severe hypokalemia, which can cause symptoms such as severe muscle weakness, low blood pressure, lightheadedness or faintness, abnormal heart rhythms, or even respiratory failure.

200. Importantly, both lactic acidosis and hypokalemia are conditions that are normally caused by more serious, underlying health problems, such as kidney and/or liver failure, pulmonary disorders, circulatory disorders, sepsis, cancer, or diabetes.

201. Providers at St. John gave Ms. Bradley continuous IV fluids with electrolytes to even out her dangerously elevated lactic acid and dangerously low potassium.

202. Ms. Bradley stayed overnight at St. John while providers treated her acute lactic acidosis and hypokalemia. Once St. John providers had temporarily gotten Ms. Bradley's lactic acid and potassium levels back to normal ranges, she was discharged at approximately 10:30 a.m. on December 24, 2022.

203. Upon discharge, St. John providers cautioned that if Ms. Bradley's problems worsened or she acquired new symptoms, she should return to the ER immediately for further care.

204. Upon information and belief, once Ms. Bradley returned to her cell from St. John, her medical condition was temporarily improved due to the IV treatment she received at the hospital. However, her mental health conditions were still not adequately controlled.

205. Once Ms. Bradley was back at the Jail, Turn Key APRN Judy Wagga, who was not onsite at the Jail, made a telephonic order to give Ms. Bradley injections of Haldol (a powerful antipsychotic) 10mg and Benadryl 100mg. These injections were inappropriate and unnecessary, and served to sedate Ms. Bradley and slow her respiration. The Haldol was particularly hazardous, as it is not indicated for use in patients at special risk for the development of certain heart problems, including patients with hypokalemia.

206. Upon information and belief, Ms. Bradley's medical condition immediately began to deteriorate throughout the day of December 24, 2022 due to her underlying hypokalemia and

lactic acidosis, and exacerbated by the Haldol. Ms. Bradley resumed lying naked on the floor of her cell, could not stand or walk, and was barely responsive.

207. Upon information and belief, throughout December 24, 2022, multiple Turn Key providers, including Nurses Muriuki and Crystal Whisenhunt, found Ms. Bradley lying naked on the floor of her cell, unable to stand or walk, unresponsive to verbal stimuli.

208. Upon information and belief, at approximately 3:00 a.m. on December 25, 2022, Turn Key nurse Irene Muriuki, LPN, observed Ms. Bradley in her cell. Ms. Bradley was unresponsive to verbal stimuli, and Nurse Muriuki had to physically touch/shake Ms. Bradley to get her to respond. Ms. Bradley was eventually able to say "stop" to Nurse Muriuki. Despite barely being able to rouse Ms. Bradley, who was still suffering from obviously emergent medical and mental health conditions, Nurse Muriuki left the cell and continued with her shift. In deliberate indifference to Ms. Bradley's serious medical needs, Nurse Muriuki failed to refer Ms. Bradley to a physician or mid-level provider and failed to send her to an offsite hospital for an emergent evaluation.

209. At approximately 5:00 p.m. on December 25, 2022, Turn Key nurse Lyric Brooks, LPN encountered Ms. Bradley during pill pass. Nurse Brooks observed Ms. Bradley in the same emergent state she'd been in for the previous several hours and days: lying naked on the floor of her cell not responsive to verbal stimuli. By this point, Ms. Bradley had been lying naked on the floor of her cell, catatonic, for approximately 28 hours, ignored by the few members of the Jail and Jail medical personnel who were staffed on Christmas, despite her obviously emergent medical and mental health conditions.

210. Upon information and belief, Nurse Brooks called a Turn Key Charge Nurse to notify him about Ms. Bradley's obviously emergent condition. The Charge Nurse responded that Ms. Bradley's condition was normal and she'd been in that same state since she returned from St. John.

211. Both Nurse Brooks and a TCSO deputy told the Charge Nurse that Ms. Bradley's condition was *not* normal based on their knowledge of Ms. Bradley's typical state and demeanor from previous interactions with her at the Jail.

212. The Charge Nurse reluctantly came to Ms. Bradley's cell to "assess" her and brushed off Nurse Brooks' and the deputy's concern, callously stating that Ms. Bradley was fine.

213. Still alarmed at Ms. Bradley's obviously dire condition, Nurse Brooks tried to get in contact with someone in the Mental Health department at the Jail, but no one answered due to the understaffing on Christmas.

214. Nurse Brooks did not attempt to give Ms. Bradley her medications because Ms. Bradley was not cognitively alert and Nurse Brooks feared Ms. Bradley was at a risk of aspiration if she tried to give her pills to swallow.

215. Shortly before 7:30 p.m. on December 25, 2022, Nurse Muriuki returned to Ms. Bradley's cell. Ms. Bradley did not respond to Nurse Muriuki calling out her name. Nurse Muriuki entered the cell and tried to get Ms. Bradley to respond to physical stimuli – a sternal rub – but was unsuccessful. Nurse Copeland was called and came to Ms. Bradley's cell. Ms. Bradley's respirations were shallow. She was clearly near death.

216. EMSA was called and arrived at Ms. Bradley's cell at 7:36 p.m. EMS found Ms. Bradley unresponsive and in respiratory distress. EMS intubated Ms. Bradley and transported her to St. John's ER.

217. Shortly after arriving at St. John, Ms. Bradley had a brief pulseless electrical activity ("PEA") arrest.[3] Unfortunately, she never regained consciousness.

---

[3] PEA arrest is a form of cardiac arrest in which a patient has a heart rhythm that should produce a pulse, but does not. Causes of PEA arrest are known as the "Hs and Ts": hypoxia, hypovolemia, hypothermia, hyper/***hypokalemia***, ***hydrogen ion (aka acidosis),*** tension pneumothorax, tamponade (cardiac), toxins, and thrombosis (cardiac/pulmonary).

218. Ms. Bradley was just 25 years old when she died.

219. On August 10, 2023, Montoya Holmes was booked into the Tulsa County Jail.

220. Ms. Holmes suffered from serious asthma and required an inhaler, facts she told Turn Key staff during her booking. She also told Turn Key staff that she had been to the ER the previous day for a severe asthma attack.

221. During booking, Ms. Holmes told Turn Key officials her last doses of her asthma medicine were the previous day, August 9, 2023, and that it was imperative that she receive her asthma medicine and inhaler immediately.

222. Inexplicably, Turn Key officials ignored Ms. Holmes' urgent pleas for her asthma medication.

223. Ms. Holmes was in obvious medical distress, showing symptoms such as shortness of breath, fatigue, and chest pain, yet Turn Key officials ignored her emergent medical condition.

224. On August 11, 2023 at around 5:00 p.m., Ms. Holmes was found unresponsive in her cell.

225. She was transported by EMSA to St. John, but she tragically passed away. Upon information and belief, Ms. Holmes died due to heart problems caused by her asthma.

226. During her two days at the Jail, Ms. Holmes never received the prednisone which had been prescribed at the ER on August 9 to treat her acute asthma-related condition, despite Jail staff and Turn Key staff's awareness of Ms. Holmes' hospital visit and prednisone prescription. Ms. Holmes' estate has brought claims, pursuant to 42 U.S.C. § 1983, against Turn Key, among others. *See Green v. Turn Key Health Clinics, LLC, et al.*, Case No. 25-CV-412-JDR-CDL (N.D. Okla.).

227. On or around December 6, 2022, Carolyn Brown was arrested and taken to the Tulsa County Jail. At the time, Ms. Brown was 61 years old.

228. On or about January 5, 2023, Ms. Brown began to feel seriously ill. She had a severe headache, sinus and chest congestion, and a harsh cough that continuously produced phlegm. She

also became extremely fatigued.

229. Upon information and belief, Ms. Brown reported her severe symptoms to Jail staff and Turn Key staff multiple times on January 5, 6, and 7, but no care was provided.

230. On January 7, 2023, at approximately 12:05 p.m., Ms. Brown submitted a sick call request indicating that her ongoing symptoms were rapidly increasing. Ms. Brown specifically noted that she had symptoms consistent with influenza. This is significant because in the previous week, a large number of inmates in Ms. Brown's cell had tested positive for the flu.

231. Turn Key nurse Emily Maxwell, LPN responded the following day, January 8, 2023, that Ms. Brown would be seen "by the next available Sick Call Nurse."

232. At approximately 12:37 p.m. on January 8, Nurse Maxwell saw Ms. Brown.

233. Ms. Brown reported to Nurse Maxwell that in addition to the severe headache, sinus and chest congestion, harsh, productive cough, and fatigue – symptoms she had been complaining about for the previous three days – she had a new symptom: an extremely sore and inflamed throat.

234. Nurse Maxwell also noted that Ms. Brown had visible swelling in her nasal area and her neck glands, the latter of which were tender to palpation.

235. Upon information and belief, Ms. Brown also reported that she had significant difficultly eating, both due to her sore throat and a lack of appetite from her illness.

236. Nurse Maxwell attempted to take Ms. Brown's vitals, but the blood pressure cuff allegedly malfunctioned, so Ms. Brown's blood pressure was not taken. Notably, however, Ms. Brown's oxygen saturation had again dropped, this time to 97%.

237. It was obvious from Ms. Brown's serious and worsening condition that she, too, had the flu.

238. It was obvious from Ms. Brown's serious and worsening symptoms that she needed to be evaluated by a physician or sent offsite for treatment.

239. However, in deliberate indifference to Ms. Brown's serious medical needs, she was not seen by a physician, NP, PA, or even an RN. Nor was Ms. Brown even tested for the flu.

240. Upon information and belief, Nurse Maxwell called Andrew Skousen, DNP[4], regarding Ms. Brown. Upon information and belief, DNP Skousen, in response to hearing about Ms. Brown's serious and worsening symptoms, merely recommended that Nurse Maxwell start Ms. Brown on Zyrtec, an allergy medication, Mucinex, and Tylenol.

241. However, Ms. Brown ***never received even these basic over-the-counter medications.***

242. Indeed, upon information and belief, after seeing Nurse Maxwell, Ms. Brown was sent back to her general population cell – having received no medications – where her medical and mental health condition continued to rapidly decline.

243. Upon information and belief, on January 9, 2023, Ms. Brown's condition took another sharp turn for the worse.

244. Upon information and belief, Ms. Brown's headache, cough, and fatigue became more severe. Additionally, the swelling in her throat and neck was more pronounced. In combination, Ms. Brown's symptoms made it exceedingly difficult for her to breathe.

245. Upon information and belief, Ms. Brown was so sick that she couldn't even get up off her bunk, and could not come to the door of her cell for pill pass.

246. Nonetheless, despite a known flu outbreak in Ms. Brown's cell and an awareness that Ms. Brown was quickly getting worse, no member of Jail staff or Turn Key staff ***did anything for Ms. Brown.***

---

[4] "DNP" stands for "Doctor of Nursing Practice." A DNP is a practice-focused doctorate that focuses on applying research and skills in a clinical setting.

247. On January 9, 2023, Ms. Brown was provided absolutely no medical assessment or treatment, despite Jail staff and Turn Key staff's awareness of a flu outbreak and Ms. Brown's rapidly deteriorating condition. Ms. Brown's condition was obviously emergent, yet she was completely ignored.

248. At approximately 10:30 a.m. on January 10, 2023, it is believed that Ms. Brown was seen by nurse practitioner Judy Wagga, APRN-CNP on a "routine follow-up."

249. Upon information and belief, by January 10, Ms. Brown's condition was dire. Her already severe symptoms continued to worsen, and her breathing was noticeably labored. Indeed, by this time, Ms. Brown had developed pneumonia from her untreated influenza infection. Further, upon information and belief, Ms. Brown's uncontrolled mental health conditions, in conjunction with her emergent medical condition, rendered her delirious and unable to coherently communicate.

250. In the face of Ms. Brown's obviously emergent mental and medical condition, APRN Wagga did absolutely nothing. She did not take Ms. Brown's vitals[5], did not have her assessed by a physician, did not provide any treatment, and did not have Ms. Brown transported to the hospital.

251. Instead of trying to help the dying Ms. Brown, APRN Wagga noted that Ms. Brown was "non-complian[t]" with her medications. Therefore, Wagga discontinued Ms. Brown's medications. As discussed above, however, Ms. Brown had deteriorated to the point that she was unable to even get up to try to take her medications.

252. APRN Wagga also scheduled Ms. Brown for a psychiatry follow-up in ***180 days.***

---

[5] Based on Ms. Brown's worsening symptoms and her vitals from January 8, it can be inferred that had APRN Wagga (or any other medical provider) taken Ms. Brown's vitals on January 10, she would have had a fever, and her oxygen saturation would have dropped to dangerously low levels.

253. Upon information and belief, Wagga then left Ms. Brown, who was close to death, lying in her cell.

254. Upon information and belief, Ms. Brown was not provided any further medical assessment or treatment on January 10.

255. The morning of January 11, 2023, shortly before 9:00 a.m., Ms. Brown was found unresponsive in her cell.

256. Ms. Brown's jaw was clenched and there was blood in her mouth. An ambulance was called and EMSA personnel arrived at the scene a few minutes later. EMSA providers were forced to insert a nasal trumpet into Ms. Brown's nose in an effort to restart her breathing, as they could not open her mouth enough to intubate her. EMSA providers took Ms. Brown's blood sugar, which registered a dangerously low 20, likely from her inability to eat in the previous days.

257. Tragically, Ms. Brown could not be resuscitated, and she was officially pronounced dead at 9:33 a.m.

258. The Medical Examiner determined that Ms. Brown's cause of death was acute pneumonia due to influenza A viral infection.

259. In each of these instances, there was an utter lack of physician supervision over the clinical care provided to the inmates. And each of these inmates, with obvious, serious and emergent medical and mental health conditions, was kept at the jail when they clearly should have been transported to a hospital or other off-site provider capable of assessing and treating the conditions.

260. By its design, the Turn Key medical system was destined to fail.

261. At all pertinent times, William Cooper, D.O., was the "Medical Director" for Turn Key. In an effort to cut costs, Turn Key and Dr. Cooper spread the few physicians and mid-level providers they employ far too thin, making it impossible for them to medically supervise, let alone provide appropriate on-site medical care, at any of the county jails under contract with Turn Key.

262. In essence, Turn Key employs a small number of mid-level providers, such as physician's assistants or nurse practitioners, and physicians who travel all over the State (and sometimes to other states, such as Arkansas and Kansas) to each of the jails for short blocks of time. This constitutes plainly insufficient medical staffing, particularly for a large institution like the Tulsa County Jail.

263. With no physician reasonably available to medically supervise the care provided to the inmates, undertrained personnel were left to practice outside the scope of their training.

264. In other words, Turn Key had a policy, practice or custom of inadequately staffing county jails, including the Tulsa County Jail, with undertrained and underqualified medical personnel who are ill-equipped to evaluate, assess, supervise, monitor or treat inmates, like Mr. Hogan, with complex and serious medical and mental health needs, including cardiovascular disease, congestive heart failure, chronic obstructive pulmonary disease, and severe mental illness.

265. With wholly inadequate physician oversight of the clinical care, the non-physician staff was improperly, and dangerously, expected to act in the role of a physician, with the understanding that off-site care was to be avoided.

266. This system, designed to minimize costs at the expense of inmate care, obviously placed inmates with complex, serious and life-threatening medical and mental health conditions, like Mr. Hogan, at substantial risk of harm.

267. This system, which Turn Key implemented company-wide, was substantially certain to, and did, result in constitutional deprivations.

268. TCSO and the County were on notice that the medical care and supervision provided by Turn Key and the detention staff was wholly inadequate and placed inmates like Mr. Hogan at excessive risk of harm. However, TCSO and the County failed to alleviate the known and obvious risks in deliberate indifference to the rights of inmates like Mr. Hogan.

269. By simply retaining Turn Key as the medical provider at the Jail in light of the obviously substandard care that Turn Key has provided, and continues to provide, to inmates at the Tulsa County Jail and county jails all over Oklahoma, Arkansas, and Kansas, TCSO/the County are deliberately indifferent to inmates' serious medical needs.

270. TCSO/the County are aware, or should be aware, of Turn Key's repeated failures to provide constitutionally adequate medical care for inmates, yet TCSO/the County have made the conscious decision to retain Turn Key as the Tulsa County Jail's medical provider.

271. Moreover, Dr. Cooper, Turn Key's Medical Director, has maintained a policy, at the corporate level, of intentionally omitting information about inmates' negative health outcomes from written documentation, and has ordered Turn Key personnel to keep such bad news out of written communications.

272. This policy, in and of itself, constitutes deliberate indifference to the health and safety of Turn Key's patients.

273. Turn Key has maintained a custom of inadequate medical care and staffing at a corporate level which poses excessive risks to the health and safety of inmates like Mr. Hogan.

274. There is an affirmative link between the aforementioned unconstitutional acts and/or omissions of Turn Key staff, including Nurse Mobley and DNP Skousen, and policies, practices and/or customs which Turn Key promulgated, created, implemented and/or possessed responsibility for.

275. Mr. Hogan suffered from serious, chronic cardiovascular and respiratory conditions and a severe mental illness that rendered him unable to advocate for his own medical needs. In deliberate indifference to these serious medical needs, neither Nurse Mobley, DNP Skousen, nor any other Turn Key or TCSO employee/agent obtained Mr. Hogan's medical history, ensured that he was evaluated by a physician, adequately monitored his cardiovascular condition, or

transferred him to a facility capable of providing the care his condition required. Instead, Mr. Hogan was discharged from the Chronic Care Clinic, left in restrictive housing, and effectively denied adequate medical care until he was found in cardiac arrest in his cell. This was callous and reckless indifference.

276. It was obvious that Mr. Hogan's serious cardiovascular and respiratory conditions required physician evaluation and ongoing monitoring and treatment. Yet, despite the obvious and excessive risks to his health and safety, Nurse Mobley, DNP Skousen, and the other Turn Key employees/agents referenced above ignored those risks, ignored basic medical practices and standards, and failed to ensure that Mr. Hogan received the care he needed.

277. Even if no single Turn Key or TCSO employee/agent had violated Mr. Hogan's constitutional rights, Turn Key and the Sheriff would still be liable under a theory of a systemic failure of its policies and procedures as described herein. There were such gross deficiencies in the medical delivery system at the Jail that Mr. Hogan was effectively denied constitutional medical care.

278. In addition, TCSO has utterly failed to train its detention staff in how to properly care for or supervise inmates, like Mr. Hogan, with complex or serious medical needs, with deliberate indifference to the health and safety of those inmates.

279. TCSO's failure to train and supervise Jail staff was admitted in 2018 by the TCSO Jail Administrator, who sent an email to Jail supervisors concerning Jail staff's many failures, in which he concluded: "What I see now is either people don't have the abilities to complete or excel in their positions which means we as a whole have failed. We either didn't train them, we didn't challenge them, we didn't hold them accountable (which doesn't always mean discipline)...."

## **<u>CAUSES OF ACTION</u>**

## **VIOLATION OF THE FOURTEENTH AMENDMENT TO THE**

**CONSTITUTION OF THE UNITED STATES**
**(42 U.S.C. § 1983)**

280. Paragraphs 1-279 are incorporated herein by reference.

**A. Underlying Violations of Constitutional Rights/Individual Liability**

281. The Turn Key/TCSO staff, including Nurse Mobley and DNP Skousen, as described above, knew or it was obvious that Mr. Hogan's health and safety was at substantial risk.

282. As described *supra*, Mr. Hogan had serious, chronic and ongoing medical needs, including serious cardiovascular and respiratory conditions, that were known and obvious to the Turn Key/TCSO employees/agents, and a severe mental illness that rendered him unable to reliably report his medical history or advocate for his own care. It was obvious that Mr. Hogan needed evaluation and ongoing treatment by a physician, but such services were denied, delayed and obstructed. Turn Key/TCSO employees/agents, including Nurse Mobley and DNP Skousen, disregarded the known, obvious and substantial risks to Mr. Hogan's health and safety by failing to adequately address his severe mental illness, failing to refer him to a physician, failing to adequately monitor and treat his cardiovascular condition, ignoring unexplained low blood pressure readings that signaled his worsening heart failure, and discharging him from the Chronic Care Clinic.

283. As a direct and proximate result of this deliberate indifference, as described above, Mr. Hogan experienced unnecessary physical pain, a worsening of his conditions, severe emotional distress, mental anguish, a loss of quality and enjoyment of life, terror and death.

284. As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

**B. Municipal/"Monell" Liability (Against Turn Key)[6]**

285. Paragraphs 1-284 are incorporated herein by reference.

286. Turn Key is a "person" for purposes of 42 U.S.C. § 1983.[7]

287. At all times pertinent hereto, Turn Key was acting under color of State law.

288. Turn Key has been endowed by Tulsa County with powers or functions governmental in nature, such that Turn Key became an instrumentality of the State and subject to its constitutional limitations.

289. Turn Key is charged with implementing and assisting in developing the policies of TCSO with respect to the medical and mental health care of inmates at the Tulsa County Jail and has shared responsibility to adequately train and supervise its employees.

290. In addition, Turn Key implements, maintains and imposes its own corporate policies, practices, protocols and customs at the Jail.

291. There is an affirmative causal link between the aforementioned acts and/or omissions of Turn Key medical staff, as described above, in being deliberately indifferent to Mr. Hogan's serious medical needs, health, and safety, and the above-described customs, policies, and/or practices carried out by Turn Key.

---

[6] "A municipal entity may be liable where its policy is the moving force behind the denial of a constitutional right, *see Monell* [*v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978), 98 S.Ct. 2018], ***or*** for an action by an authority with final policy making authority, *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 480, 482–83, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)." *Revilla v. Glanz*, 8 F. Supp. 3d 1336, 1339 (N.D. Okla. 2014) (emphasis added). Plaintiff's municipal liability claim in this action is based upon a *Monell* theory of liability, thus she need not establish that Turn Key had final policymaking authority for Tulsa County.

[7] "Although the Supreme Court's interpretation of § 1983 in *Monell* applied to municipal governments and not to private entities acting under color of state law, case law from [the Tenth Circuit] and other circuits *has extended the Monell doctrine to private § 1983 defendants." Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1216 (10th Cir. 2003) (citations omitted) (emphasis added). *See also Smedley v. Corr. Corp. of Am.,* 175 F. App'x 943, 946 (10th Cir. 2005).

292. To the extent that no single officer or professional violated Mr. Hogan's constitutional rights, Turn Key is still liable under a theory of a systemic failure of policies and procedures as described herein. There were such gross deficiencies in medical procedures, staffing and facilities, and procedures that Mr. Hogan was effectively denied constitutional conditions of confinement.

293. Turn Key knew or should have known, either through actual or constructive knowledge, or it was obvious, that these policies, practices and/or customs posed substantial risks to the health and safety of inmates like Mr. Hogan. Nevertheless, Turn Key failed to take reasonable steps to alleviate those risks, in deliberate indifference to inmates', including Mr. Hogan's, serious medical needs.

294. Turn Key tacitly encouraged, ratified, and/or approved of the acts and/or omissions alleged herein.

295. Additionally, Turn Key has maintained a healthcare delivery system at a corporate level, including at the Tulsa County Jail, that has "such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

296. There is an affirmative causal link between the aforementioned customs, policies, and/or practices and Mr. Hogan's injuries and damages as alleged herein.

**C. Official Capacity Liability (Against Sheriff Regalado)**

297. Paragraphs 1-296 are incorporated herein by reference.

298. The aforementioned acts and/or omissions of TCSO and/or Turn Key staff in being deliberately indifferent to Mr. Hogan's health and safety and violating Mr. Hogan's civil rights are causally connected with customs, practices, and policies which the County/TCSO promulgated, created, implemented and/or possessed responsibility for.

299. Such policies, customs and/or practices are specifically set forth in paragraphs 47-280, *supra.*

300. The County/TCSO, through its continued encouragement, ratification, approval and/or maintenance of the aforementioned policies, customs, and/or practices; in spite of their known and obvious inadequacies and dangers; has been deliberately indifferent to inmates', including Mr. Hogan's, health and safety.

301. The County/TCSO has maintained a healthcare delivery system at the Jail that has such "gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care." *Garcia v. Salt Lake County,* 768 F.2d 303, 308 (10th Cir. 1985).

302. As a direct and proximate result of the aforementioned customs, policies, and/or practices, Mr. Hogan suffered injuries and damages as alleged herein.

303. As a direct and proximate result of Defendants' conduct, Plaintiff is entitled to pecuniary and compensatory damages.

**WHEREFORE,** based on the foregoing, Plaintiff prays this Court grant the relief sought, including but not limited to actual and compensatory damages, and punitive damages, in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/ Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Bryon D. Helm, OBA #33003
701 S. Cincinnati Avenue

Tulsa, Oklahoma 74119
(918) 585-2667 P
(918) 585-2669 F
danielsmolen@srlawok.com
bobblakemore@srlawok.com
bryonhelm@srlawok.com

***Attorneys for Plaintiff***